UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MICHAEL CALECA, <br><br> *Plaintiff*, <br><br> v. <br><br> WILLIAM BURNS, DIRECTOR, CENTRAL INTELLIGENCE AGENCY, *et al.* <br> *Defendants.* | Case Number 1:23-cv-1184-MSN-JFA |

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant's Motion to Dismiss. ECF 26. Upon consideration of the pleadings and for the reasons set forth below, the Court will grant the motion in part and deny it in part.

I.  BACKGROUND[1]

   A.  Factual Background

Plaintiff Michael Caleca is a fifty-eight-year-old man who was hired by the Central Intelligence Agency ("CIA") as a targeting analyst in 2003. ECF 22 ("FAC") ¶ 26. Since 2004, Caleca has been detailed to the Office of the Director of National Intelligence ("ODNI"). *Id.* ¶ 27. Plaintiff's first line supervisor was Branch Chief Mark Demers (who is about six years younger than Caleca), an employee of the Department of the Treasury who was also detailed to ODNI. *Id.* ¶ 28. Plaintiff's second line supervisor was Deputy Group Chief Brandon Beach (who is about

---

[1] The Court assumes the truth of Plaintiff's factual allegations and draws all reasonable factual inferences in Plaintiff's favor for purposes of this motion. *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002). However, "[t]readbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

1

four years younger than Caleca), an employee of ODNI. *Id.* ¶ 29. At the time of the alleged discrimination, Caleca was about fifty-two years old. *Id.* ¶ 25.

Around May 2019, Caleca's supervisors began falsely criticizing his performance and failing to provide timely feedback about his work. FAC ¶ 31. For example, Demers reviewed a document Caleca wrote and made substantial, unwarranted changes, even after another person had reviewed the same document without making any significant edits. *Id.* ¶ 32. Additionally, Caleca's performance appraisal falsely cited the assignment as having been completed in 2020 rather than 2019, giving the impression that he had not completed it timely. *Id.* In another incident around August 2019, management delayed reviewing one of Caleca's assignments for more than three months. The intent and effect of this lengthy review was to give the false impression that Plaintiff was not efficient with his work. *Id.* ¶ 33.

On or around March 5, 2020, Demers, Beach, and others, assigned Caleca to an advanced work plan ("AWP")—a sign of performance issues—without warning or explanation. *Id.* ¶ 53. The AWP was purportedly based on Caleca's work from October 2019 through the first half of March 2020. *Id.* ¶ 55. None of managements' edits on Caleca's AWP project indicated any issues related to critical thinking, analysis, argument construction, tradecraft issues, or Caleca's writing. *Id.* ¶ 55.

In March 2020, employees began working from home due to the COVID-19 pandemic. *Id.* ¶ 43. Caleca requested to come into the office to log into his accounts and retrieve tax information, but management denied these requests. Caleca was told to stay home to "protect his health." *Id.* ¶ 45. During this time other employees, including some younger employees were allowed to come to the office to work on assignments on a rotational basis. *Id.* ¶ 48. These restrictions negatively affected Caleca because he was not assigned to new projects during his time out of office and was forced to play catch-up on old work. *Id.* ¶ 49-52. Caleca's AWP was a "90-day" AWP, but because

he was only coming into the office once every two weeks due to the COVID-19 restrictions, he only had 40 business days to finish the 90-day plan. *Id.* ¶ 57.

Shortly thereafter, Demers assigned Caleca to a data science project, asking him to format data to ensure that there were no errors, even though Demers knew that the project required technical skills Caleca did not have. *Id.* ¶ 35. Management did not provide training for the specific data visualization software required for the project. *Id.* ¶ 37. Caleca requested technical assistance from the Agency's data science services office, but Demers denied that request without explanation. *Id.* ¶ 36. Caleca was ultimately paired with an Agency data scientist who was unable to provide information until three months after Caleca requested it. *Id.* ¶ 38.

In October and December 2020, Caleca met with two different computer scientists for assistance on his data project, but they could not provide solutions. *Id.* ¶ 39. An Agency data science office stated it could provide Caleca assistance if his management made a specific request, but management refused to make the request without explanation. *Id.* ¶ 40.

Caleca alleges that around this time, Demers deliberately delayed review of his work for the AWP. *Id.* ¶ 58. While younger analysts had their work reviewed promptly, these delays placed Caleca in jeopardy of failing the timelines of the AWP. *Id.* ¶ 60.

During this time, management also repeatedly changed project standards. *Id.* ¶ 61. For example, Demers forced Caleca to change the methods he used to provide analysis when working on the AWP. This change violated analytic tradecraft protocols, such as procedures for developing specific analytic lines, using all source analysis, and reviewing the data for errors or other discrepancies. *Id.* ¶ 62.

Around this time, Demers claimed in an email that it took him thirty-three hours to edit ten pages of Caleca's work, which Caleca believed could not be true. *Id.* ¶ 67. Caleca raised the issue

twice with Dean Caras, making clear that Demers's review of his work was wrong. *Id.* ¶ 68. Caleca asked Demers to provide proof that it took him thirty-three hours to edit Caleca's work, and Demers refused. *Id.* ¶ 69. On January 28, 2021, Dean Caras sent an email stating Caleca's suggestion that Demers "lied" about how long it took him to edit his work would not be tolerated. *Id.* ¶ 70. Caleca replied that he would meet with everyone to discuss the issue. *Id.* In a February 5, 2021, meeting with Caras, Beach, Demers, and Agency Human Resources (HR) representative Jennifer Wachunas, Caleca apologized for using the word "lie" to describe Demers' comment, but insisted it could not be true. *Id.* ¶¶ 71-72. The managers declined Caleca's request to discuss the issue. *Id.*

One week later, Caras and Beach placed Caleca on a performance review plan ("PIP") that was set to run from February 15, 2021 to May 15, 2021. *Id.* ¶ 73. Caras and Beach would not give Caleca a copy of the PIP or even show it to him.[2] *Id.* ¶ 74. Even when management extended the PIP by another two weeks, Caleca did not receive a copy of it. *Id.* ¶ 75.

The PIP required Caleca's work to be finished within three weeks (including conceptualizing the work, providing a written draft, coordinating the draft, and obtaining approval from all four managers), but his work schedule only allowed him to work three days a week. *Id.* ¶ 80. There were no provisions in the PIP to address delays arising from coordination with other offices and agencies. *Id.* Caleca asked for some language to address this contingency, allowing for deadline extensions when coordination took longer to complete, but Demers refused. *Id.* ¶ 81.

Throughout the PIP period, Beach and Demers failed to provide necessary information about assignments and stifled Caleca's ability to perform. *Id.* ¶ 77. For example, on or around February 15, 2021, Plaintiff was assigned a targeting task. The project was unnecessarily delayed,

---

[2] Later in the complaint, Caleca states that there were "no provisions in the PIP to address delays," *Id.* ¶ 81, which seems to contradict his earlier statement that he was not given a copy of the PIP or even allowed to see it. *Id.* ¶ 74.

4

however, because management incorrectly told Caleca that he was using improper "terminology" for the work. *Id.* ¶ 78. On or around February 25, 2021, Demers delayed escalating Caleca's piece to upper management review for five days because of this terminology dispute. *Id.* ¶ 79.

On March 19, 2021, Caleca complained to the U.S. Equal Employment Opportunity Commission ("EEOC") that he was being subjected to age discrimination. *Id.* ¶ 6. Around this same time, Caleca began expressing concerns about his work standards to management, including to Demers and Beach. *Id.* ¶ 64. Around March 2021, Defendants asked Caleca not to teach a class on open-source analysis, bypassing him in favor of another analyst. *Id.*

On or around March 20, 2021, Caleca began work on another project. Demers also delayed in reviewing Plaintiff's work on this project, preventing him from meeting deadlines. *Id.* ¶ 82.

At a weekly meeting on or around April 14, 2021, Beach again criticized Caleca's work. *Id.* ¶ 84. A senior analyst had independently reviewed this same work, and found it to be solid in its analysis and ready for passage to tradecraft review and publication. *Id.* ¶ 85.

On or around April 20, 2021, Caleca told Demers that he was concerned about management failing to properly review Plaintiff's documents. *Id.* ¶ 86. Demers dismissed his concerns and chastised Caleca for allegedly being argumentative. *Id.*

In or around early June 2021, Demers became aware of Caleca's protected EEOC activity. *Id.* ¶ 90. In unidentified testimony, Caras testified that he, Demers, and Beach all became aware of Caleca's EEO activity "around the same time" and that Caleca had informed management on several occasions that he had an attorney. *Id.* ¶ 91.

Shortly thereafter, on or around June 23, 2021, Demers and Beach issued Caleca a failed rating on the PIP. *Id.* ¶ 87. In the PIP review, Demers and Beach made numerous misstatements. *Id.* ¶ 88. Some time after he failed his first PIP, Plaintiff was placed on a second PIP. *Id.* ¶¶ 94-95.

Caleca does not indicate when he was placed on a second PIP but alleges that at the close of the meeting where the second PIP was issued, he informed management he was leaving to speak with his attorney. *Id.* ¶ 95.

Between August and October 2021, Agency management denied or hindered his ability to take beneficial reassignment opportunities, which would have enabled him to avoid termination. *Id.* ¶ 98. On October 6, 2021, the Agency notified him that the Performance Review Board would convene to review his suitability for continued employment on October 26, 2021, before the close of Caleca's second PIP. *Id.* ¶ 96.

On November 3, 2021, Defendants notified Caleca that his employment was being terminated. *Id.* ¶ 99.

**B. Procedural History**

Caleca filed a Complaint, ECF 1, on May 31, 2023, in the United States District Court for the District of Columbia. On September 6, 2023, the case was transferred to this Court. ECF 13. After Defendants filed a motion to dismiss, ECF 17, Plaintiff filed his First Amended Complaint, ECF 22, which is operative here. The Complaint contains two counts, which are really three claims. The first count alleges that Defendants subjected Caleca to disparate treatment and a continuing hostile work environment in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.*, (ADEA) by falsely criticizing his work performance, intentionally assigning him to projects outside of his areas of expertise, refusing to provide him with technical assistance, denying him opportunities to work on projects, giving him unfair feedback on performance reviews, and changing performance standards and deadlines. FAC ¶¶ 101-109. In count two, Caleca claims that Defendants violated the ADEA by retaliating against him because he lodged protected complaints. *Id.* ¶¶ 110-114.

6

Defendants have moved to dismiss the Amended Complaint, ECF 26, and after full briefing, the motion is ripe for resolution.

## II. LEGAL STANDARD

This Court may grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) when a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint fails under Rule 12(b)(6) if it does not contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). While a plaintiff does not need to include "detailed factual allegations" to sufficiently state a claim under Rule 8(a), they must make more than bald accusations. *Twombly*, 550 U.S. at 555 (holding that "naked assertions devoid of further factual enhancement" and "formulaic recitation[s] of the elements of a cause of action" are insufficient under Rule 12(b)(6)); *see also Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).

When considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citation omitted). The Court, however, need not credit conclusory allegations. *See Iqbal*, 556 U.S. at 675. Taking as true all well-pled accusations, the Court must determine if the complaint raises the claim for relief "above the speculative level." *Twombly*, 550 U.S. at 555.

## III. ANALYSIS

Caleca's Amended Complaint contains three claims alleging, in turn, discrimination by his employer on the basis of his age, a hostile work environment, and retaliation based on his protected activity. By and large, Caleca has failed to state a plausible claim for relief, and the majority of his

Complaint will be dismissed. The Court will not dismiss one element of Plantiff's retaliation claim, where he has adequately alleged that his protected activity caused Defendants to decide that he failed his PIP.

### A. Age Discrimination Claim

To make out an age discrimination claim, Caleca must show that: he is "(1) over the age of 40, and (2) experienced discrimination by an employer (3) because of his age." *Tickles v. Johnson*, 805 F. App'x 204, 207 (4th Cir. 2020). The ADEA establishes a claim where personnel actions are "[]tainted by any consideration of age." *Babb v. Wilkie*, 589 U.S. 399, 402; 29 U.S.C. § 633a. This means that for their claim to be actionable, a plaintiff must show that the age-based treatment they experienced qualified as a "personnel action"—not every action will suffice. Caleca's age discrimination claim fails for two reasons: (1) he does not plausibly allege that he experienced any adverse action *because of* his age; and (2) many of the harms alleged are not actionable personnel actions.

### i. Caleca has not plausibly alleged that the treatment he experienced was based on his age.

Caleca alleges that his managers discriminated against him based on his age by "falsely criticizing his work performance, intentionally assigning [him] to projects outside of his areas of expertise, refusing to provide technical assistance, denying him opportunities to work on projects, giving him unfair feedback on performance reviews, and changing performance standards and deadlines." ECF 22 ¶ 4. While Caleca repeatedly asserts that younger employees received different treatment, Caleca fails to allege any substance to support those allegations.

While Caleca is not required to *prove* his case at this stage, his complaint must allege sufficient facts that push his claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. This means he cannot rely solely on conclusory allegations or "naked" assertions.

8

*Iqbal*, 556 U.S. at 678–79. But that is just what he does. Again and again, Caleca simply alleges that "Defendants did not subject younger analysts to such treatment," without any further factual support. Am. Compl. ¶¶ 4, 34, 42, 60, 66, 78, 83; *see also* ECF 27 at 10. Without such "factual enhancement," the Court can only speculate as to whether Caleca's treatment was connected to his age. *McCleary-Evans v. Md. DOT*, 780 F.3d 582, 585 (4th Cir. 2015) (quoting *Iqbal,* 556 U.S. at 678); *Guillen v. Esper,* 2020 WL 3965007, at *10 (E.D. Va. July 13, 2020) (holding that "mere speculation which impermissibly requires the court to fill in the gaps as to a defendant's motivation" is "insufficient to survive a motion to dismiss"). Accordingly, Caleca has "not nudged" his age discrimination claim "across the line from conceivable to plausible," and it "must be dismissed." *Twombly*, 550 U.S. at 570.

    ii.    **Caleca has not established that much of the treatment he experienced constituted adverse actions under the ADEA.**

Even if the Court were able to credit Caleca's conclusory statements that he suffered disparate treatment because of his age, many of Defendant's alleged actions do not rise to the level of actionable adverse events. Under 29 U.S.C. § 633a(a), employees can bring suit for any "*personnel actions*" that involved "discrimination based on age" (emphasis added). Courts have long read this requirement to apply to both private and federal employees and have determined that the provision requires an employer's action to impact the "compensation, terms, conditions, or privileges of employment." *See id.* § 623(a)(1); *see also, e.g., Peary v. Goss*, 365 F. Supp. 2d 713, 722 (E.D. Va. 2005); *Burgoon v. Potter*, 369 F. Supp. 2d 789, 796-97 (E.D. Va. 2005). The Fourth Circuit has defined an "adverse employment action" as one which caused "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or . . . a significant change in benefits." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011).

9

However, in *Babb v. Wilkie*, the Supreme Court in *dicta* instead applied to an ADEA claim the definition of "personnel action" contained in the Civil Service Reform Act of 1978 ("CSRA"). 589 U.S. at 405. The CSRA's definition of personnel action includes: (1) an appointment; (2) a promotion; (3) a suspension or "other disciplinary or corrective action;" (4) transfer or reassignment; (5) performance evaluation; (6) a "decision concerning pay, benefits, or awards;" and (7) "any other significant change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A).

Even adopting the CSRA's more permissive definition, most of the actions Caleca alleges do not fall into any one of its categories. For example, Caleca states that his employers criticized his work performance, assigned him to projects outside of his expertise, and failed to provide him with technical assistance. ECF 22 ¶ 4. None of these claims rises to the level of a "*significant change in duties, responsibilities, or working conditions.*" 5 U.S.C. § 2302(a)(2)(A). Even accepting that Caleca was criticized, assigned to projects outside of his usual expertise, and was denied timely technical assistance, these actions did not represent a substantial change to his usual duties or employment conditions. *See Jensen-Graf v. Chesapeake Employers' Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015). Caleca's "dissatisfaction" with his working conditions, without more, does not meet the standard for either an adverse employment action or a personnel action. *See James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 377-78 (4th Cir. 2004).

Caleca also alleges that he was passed over for (1) new opportunities during the COVID-19 pandemic, and (2) a teaching position that he had previously held. Neither constitutes a significant change in responsibilities. First, Caleca argues that he was required to work from home during the pandemic and was thereby denied new opportunities for work. But his Complaint does not allege any detail regarding his employer's general work-from-home policies, and whether they adversely

10

affected him in a manner that did not apply to all similarly-situated employees. His blanket assertion that unidentified "younger employees" were allowed to work in person is insufficient to demonstrate that his inability to do so was a personnel action with respect to him in particular. *See* FAC ¶ 48.

Second, Caleca argues that he was removed from a teaching role in a class on open-source analysis. FAC ¶ 64. This claim also cannot stand the test for a "significant change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A). Caleca acknowledges that this was only a class he taught "when requested;" *i.e.*, teaching was not part of his regular work responsibilities. FAC ¶ 64. Even if Caleca was "bypassed" by management in favor of another analyst, it does not rise to the level of an personnel action that could form the basis of an ADEA claim. *See Spencer v. Va. State Univ.*, 224 F. Supp. 3d 449, 459-60 (E.D. Va. 2016) (concluding that it was not a materially adverse action under a retaliation claim to deny the plaintiff a chance to teach a class outside of the university).

On the other hand, Defendants concede that Plaintiff's failed PIP rating and eventual termination are personnel actions within the meaning of the ADEA. ECF 27 at 15 n.5. The Court also finds that Plaintiff's allegations of unfair feedback on his performance reviews constitute a personnel action under the CSRA, as they involve performance evaluations plausibly within the meaning of 5 U.S.C. § 2302(a)(2)(A)(viii).

Accordingly, even if Caleca had shown his treatment was because of age, the only allegations that would qualify as "personnel actions" under the ADEA are his placement on a PIP, his performance evaluations, and his eventual termination.

### B. Hostile Work Environment Claim

To make out a hostile work environment claim, Caleca must show that he was (1) over 40 years old; (2) harassed *based on* his age; (3) that the harassment was sufficiently severe or pervasive to create an environment that was subjectively and objectively hostile. *Burns v. AAF-McQuay, Inc.,* 166 F.3d 292, 294 (4th Cir. 1999). Caleca's hostile work environment claim fails because he does not plausibly allege that he experienced any hostile behavior *because of* his age or that any age-based harassment that did occur was sufficiently severe or pervasive.

### i. Plaintiff has not plausibly alleged that the unwelcome behavior was based on Plaintiff's membership in any protected class

Caleca's claim first fails because he has not alleged harassment based on his age. Caleca asserts that his managers took a variety of hostile actions, including criticizing his work, ECF 22 ¶¶ 31-32; assigning him projects outside of his area of expertise, *id.* ¶¶ 35-38; not allowing him to come to the office during the pandemic, *id.* ¶¶ 43-49; giving him unfair criticism on performance reviews, *id.* ¶¶ 31-32, 67-72, 84, 88; changing his project standards and deadlines, *id.* ¶¶ 61-64, 73; delaying review of his work, *id.* ¶¶ 32-33, 58, 82; and refusing to meet with him to discuss his concerns, *id.* ¶ 54. As discussed above, Caleca provides no evidence that these actions were taken *because of* his age. Without further factual support, the Court cannot conclude that the harassment Caleca alleges was a result of Caleca's membership in a protected class. *Webster v. Johnson,* 126 F. App'x 583, 587-88 (4th Cir. 2005) (concluding that the court "cannot jump from the mere existence of criticism to the conclusion that the criticism was . . . motivated [by membership in a protected class]"); *see also Sammarco v. Bd. of Educ. of Prince George's County*, 2013 WL 5274277, at *4 (D. Md. Sept. 16, 2013) (noting that plaintiff's claims of disparate treatment were "supported by no factual allegations such that the court can infer her treatment was based on race

or age"), aff'd, 556 F. App'x 200 (4th Cir. 2014). Therefore, Caleca has not pointed to "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

### ii. Plaintiff has not alleged objectively "severe or pervasive" conduct

Even if the Court could conclude that any harassment Caleca experienced was based on his age, Caleca's claim would still fail. To be severe or pervasive, the work environment "must be perceived by the victim as hostile or abusive, and that perception must be reasonable." *Martin v. Scott& Stringfellow, Inc.*, 643 F. Supp. 2d 770, 786 (E.D. Va. 2009) (quoting *Ziskie v. Mineta*, 547 F.3d 220, 227 (4th Cir. 2008)). To determine whether an alleged hostile environment was objectively severe, courts examine the conduct's frequency and severity, whether it is "physically threatening or humiliating," and whether it "unreasonably interferes with an employee's work performance," *Id.* at 786-787 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

To make out a case for a hostile environment, Caleca points to "shifting expectations," his assignment to projects outside of his area of expertise, and denials of technical assistance. ECF 31 at 10. He argues that these incidents "would have been objectively abusive to a reasonable person" on the ground that it was "humiliating and demeaning." *Id.* at 11. These allegations are insufficient to show severe and pervasive harassment. The Fourth Circuit has held that "a workplace dispute regarding . . . reassignment" and even "callous behavior by . . . superiors" "do[es] not describe the type of severe or pervasive gender, race, or age based activity necessary to state a hostile work environment claim." *Bass v. E.l. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003); *see also Dumbaugh v. University of Richmond*, 2019 WL 4307873, at *3 (E.D. Va. Sept. 11, 2019) (holding that "offensive and insulting comments," "unfair and public criticism," and reassignment of tasks did not amount to a hostile work environment). While Caleca's supervisor's conduct may

have been "rude and disrespectful," it was not so severe and pervasive so as to allow for a hostile work environment claim. *Bass*, 324 F.3d at 765.

### C. Retaliation Claim

To state a claim for retaliation, Plaintiff must allege that he (1) "engaged in protected activity;" (2) his employer took "an adverse employment action against him;" and (3) there was a "causal connection between his engagement in the protected activity and the adverse action." *Ramos v. Molina Healthcare, Inc.*, 963 F. Supp 2d 511, 527 (E.D. Va. 2013) (citing *Ziskie*, 547 F.3d at 229). Defendant argues that Plaintiff has satisfied neither the second nor third step of that test.

#### i. Adverse employment action

As for the second factor, Defendant argues that apart from his failing PIP rating and termination, none of its alleged actions constituted a materially adverse employment action. ECF 27 at 28-30. A "materially adverse action" is one that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 213 (4th Cir. 2022) (quoting *Burlington Northern & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 64 (2006)). This standard "separates minor harms from those that threaten to chill employees from opposing unlawful discrimination." *Id.* Under this standard, "none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, an 'Attendance Warning,' a verbal reprimand, a formal letter of reprimand, or 'a proposed termination.'" *Wonasue v. University of Maryland Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (citation omitted) (cleaned up).

14

Plaintiff does not meet this standard except as to his failing PIP rating and his eventual termination. In opposition, he points to Defendants "chang[ing] projected [sic] standards and delayed reviewing [of his] work," changes in "the methods [he] used to provide analysis," "criticiz[ing] his analytical methods," and not asking him to again teach a class on tradecraft. ECF 31 at 12. These allegations fall firmly in the category of actions that would not "dissuade a reasonable worker" from bringing an EEOC charge or engaging in other protected activity. Therefore, any claim for retaliation would have to show a causal link between protected activity and his failing PIP evaluation or his termination itself.

### ii. Causal Connection

Defendants also argue that Plaintiff has failed to plausibly allege a causal relationship between his protected activity and any adverse action. To do so, he must plead facts showing a relationship between his supervisors' knowledge of his protected activity and their adverse actions. In the absence of other facts, a plaintiff may point to temporal proximity between knowledge of protected activity and an adverse employment action, but that proximity must be "very close." *Roberts v. Glenn Indus. Grp., Inc*, 998 F.3d 111, 124, 126 (quoting *Clark County Sch. Dist. v. Bredeen*, 532 U.S. 268, 273 (2001)). The Fourth Circuit has held that while there is no "bright-line rule," lapses in time of around three to four months are insufficient to show a causal connection. *Id.* at 127.

Here, Plaintiff's only argument as to causality is based on temporal proximity, ECF 31 at 13-14. Plaintiff alleges that his supervisors all became aware of his protected activity "'between the first and second PIP,' in or about early June 2021." FAC ¶ 90. Plaintiffs' material adverse actions, his failed PIP and termination, occurred on June 23, 2021, and November 3, 2021, respectively. His failed PIP rating thus occurred at most several weeks after his supervisors learned

15

of his protected activity, but his his termination was more than four months later. While "a three-month period between the protected activity and the adverse action does not support a finding that there is a causal link," *Roberts*, 998 F.3d at 127, action "taken within days of . . . learning of the complaint . . . 'bears sufficient temporal proximity . . . to suggest that the adverse action was taken because of the protected activity.'" *Smith v. CSRA*, 12 F.4th 396, 419 (4th Cir. 2021) (quoting *Johnson v. United Parcel Service, Inc.*, 839 Fed. App'x 781, 784 (4th Cir. 2021)).

For this reason, Plaintiff has stated a claim for retaliation based on temporal proximity *only* as to his failing rating on his first PIP,

### C. Dismissal with prejudice

To the extent that the Court dismisses Plaintiff's claims, it will do so with prejudice. Defendants filed a memorandum in support of their first motion to dismiss, ECF 18, which put Plaintiff on notice of each and every one of the deficiencies upon which the Court will grant Defendants' motion to dismiss today. Therefore, dismissal of those claims with prejudice is warranted. *See United States ex rel. Nicholson v. MedCom Carolinas, Inc.* 42 F.4th 185, 196 (4th Cir. 2022) (holding that "district courts are not required to give plaintiffs one without-prejudice ruling on the merits before dismissing with prejudice" and that decisions to dismiss with prejudice are reviewed for abuse of discretion).

### IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Defendant's Motion to Dismiss (ECF 26) is **GRANTED** in part and denied in part**;** and it is further

**ORDERED** that Count I of Plaintiff's First Amended Complaint (ECF 22) is **DISMISSED** with prejudice;

**ORDERED** that Count II of Plaintiff's First Amended Complaint (ECF 22) is **DISMISSED** with prejudice, except insofar as it alleges that Defendants retaliated against Plaintiff for initiating EEO contact by issuing him a failing rating on his first PIP.

It is **SO ORDERED.**

                                                /s/
                                      Hon. Michael S. Nachmanoff
                                      United States District Judge

September 20, 2024
Alexandria, Virginia